**LAW OFFICES OF RONALD A. MARRON**
RONALD A. MARRON (SBN 175650)
*ron@consumersadvocates.com*
ALEXIS M. WOOD (SBN 270200)
*alexis@consumersadvocates.com*
KAS L. GALLUCCI (SBN 288709)
*kas@consumersadvocates.com*
651 Arroyo Drive
San Diego, California 92103
Telephone: (619) 696-9006
Facsimile: (619) 564-6665

[Additional counsel listed on signature page]

*Attorneys for Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JULIE JONES, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TONAL SYSTEMS, INC.,<br><br>Defendant. | Case No. 3:23-cv-01267-JES-BJC<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL REQUESTED** |

# FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff Julie Jones ("Plaintiff"), individually and on behalf of all others similarly situated, files this Amended Class Action Complaint against Defendant Tonal Systems, Inc., ("Defendant") as the owner and operator of Tonal.com (the "Website") for violations of the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 630–638. Plaintiff's claims arise from Defendant's secret integration of third parties' software to secretly wiretap and eavesdrop on the private conversations of users of the chat features on the Website in real time and Defendant's practice of allowing Third Parties to do so in order to harvest data for financial gain. Defendant did not obtain visitors' consent to either the wiretapping or sharing of their private conversations. As a result, Defendant and the third parties have violated the CIPA in numerous ways. Plaintiff brings these claims based upon personal knowledge, where applicable, information and belief, and the investigation of counsel, which included, among other things, consultations with experts in the field of data privacy.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over all causes of action asserted herein.

2. Venue is proper in this Court because Defendant knowingly engages in activities directed at consumers in this District and engaged in the wrongful conduct alleged herein against residents of this District.

## PARTIES

3. Plaintiff Julie Jones is a resident and citizen of California.

4. Defendant Tonal Systems, Inc., or Defendant, is a multinational corporation headquartered in California, that does business in California, and owns, operates, and/or controls the Website Tonal.com.

## STATEMENT OF FACTS

5. The California Invasion of Privacy Act ("CIPA") prohibits both wiretapping and eavesdropping of electronic communications without the consent of all parties to the communication.

6. The CIPA provides that it is a violation of Cal. Penal Code § 631(a) for any person "by means of any machine, instrument, contrivance, or in any other matter," to do any of the following:

> Intentionally tap[], or make[] any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> or
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, read[] or attempt[] to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> or
>
> Use[], or attempt[] to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> or
>
> Aid[], agree[] with, employ[], or conspire[] with any person or persons to unlawfully do, or permit or cause to be done any of the acts or things mentioned above in this section.

7. Section 631(a) is not limited to phone lines. *See Matera v. Google Inc.*, No. 15-CV-04062-LHK, 2016 WL 8200619, at *21(N.D. Cal. Aug. 12, 2016) (CIPA

applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc.*, No. C 06-05289-WHA, 2006 WL 3798134, at *5-6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' Internet browsing history).

8. Compliance with CIPA is easy, and the vast majority of website operators comply by conspicuously warning visitors if their conversations are being recorded or if third parties are eavesdropping on them. "CIPA compliance is not difficult. A business must take certain steps… with a chat feature… to ensure that it obtains valid consent consistent with the holdings of courts interpreting CIPA."[1]

9. Unlike most companies, Defendant ignores CIPA. Instead, Defendant allows Third Parties to wiretap and eavesdrop on the chat conversations of all its website visitors. Why? Because, as one industry expert notes, "Live chat transcripts are the gold mines of customer service. At your fingertips, you have valuable customer insight to make informed business decisions. . .When people are chatting, you have direct access to their exact pain points."[2]

10. Defendant's actions are not incidental to the act of facilitating e-commerce, nor are they undertaken in the ordinary course of business. To the contrary, as noted above, Defendant's actions are contrary to industry norms and the legitimate expectations of consumers.

11. To enable the wiretapping, Defendant has covertly embedded a third-party's code into its chat feature that automatically records and creates transcripts of all such conversations. To enable the eavesdropping, Defendant allows at least one independent Third Party (on information and belief, "Drift") to secretly intercept in

---

[1] *See* www. leechtishman.com/insights/blog (last accessed February 2023).

[2] *See* https://www.ravience.co/post/improve-marketing-roi-live-chat-transcripts

real time, eavesdrop upon, interpret, analyze, store, and use for that Third-Party's own purposes transcripts of Defendant's chat communications with unsuspecting website visitors – even when such conversations are private and deeply personal.

12. Chat communications on the Website are intercepted by Drift while those communications are in transit, and this is accomplished because the imbedded code directs those communications to be routed directly to Drift. Drift's chat service is an Application Programming Interface (API) that is "plugged into" the Website. The chat function is run from Drift's servers but allows for chat functionality on the Website.

13. In other words, Drift runs the chat service from its own servers, but consumers interact with the chat service on Defendant's Website. Drift operates the same way with other companies' website chat features, such as Peloton.

14. Thus, whenever a chat message is sent from a website visitor to a Tonal customer service agent, it is first routed through a Drift server. But to customers, it appears they are *only* communicating with a company representative of Defendant.

15. The Chat service needs to run on Drift servers because Drift analyzes the customer-support agent interactions in real time to create live transcripts of communications as they occur, and because Drift uses the content of chat communications to train its AI chatbots, among other services.

16. Thus, whenever a chat message is sent from a member of the Class to Defendant, it is first routed through Drift's server. This enables Drift to analyze, interpret, and collect customer-support agent interactions in real time to train its AI chatbots and to create live transcripts of communications *as they occur*, among other services.

17. Thus, through the Chat function, Drift is able to record the other electronic communications of visitors to websites where the code is installed, including the content of all chat communications between Defendant and visitors to the website.

18. Examples of these transmissions of data can be seen in the images below. As a chat message is sent to a Tonal customer service representative (picture left), network traffic simultaneously flows through a Drift web server directly to Drift (picture lower right), as indicated by the "request URL" and "referrer" being "messaging.api.drift.com" and "js.driftt.com", respectively (meaning the messages are being sent to Drift):



19. Accordingly, as currently deployed on the Websites, Drift's chat API constitutes wiretapping.

20. When Drift's chat API is used on a website conversation, it is not like a tape recorder or a "tool" used by one party to record the other. Instead, Drift's chat API involves Drift—a separate and distinct third-party entity from the parties to the conversation—using chat API to eavesdrop upon, record, extract data from, and analyze a conversation to which Drift is not a party. This is because Drift itself is collecting the content of any conversation. That data is then used by Drift, including to improve its AI chatbot technologies, before being provided to any entity that was a party to the conversation (like Tonal).

21. Once Drift intercepts the chat communications between Plaintiff (and Class Members) and Defendant, it has the capability to use such information for its own purposes.

22. For example, Drift expressly brags about how its AI chatbots are "constantly learning from their conversations—so, over time, they can adapt their responses to different patterns and new situations."[3] Drift further boasts that "our AI is continually refining its training with more and more conversations every day — which means it's always improving."[4]

23. The improvements to Drift's AI chatbots developed as a result of those chatbots "constantly learning from their conversations" are not limited to the AI chatbots that Drift employs on Tonal's website, but instead are globally incorporated into Drift's AI chatbot technology that it sells as a service to numerous other companies, such as Peloton. Thus, when Drift employs AI chatbots into its services, among other acts, Drift's capability to use website visitors' communications where

---

[3] https://www.drift.com/learn/chatbot/ai-chatbots/

[4] https://www.drift.com/learn/conversational-ai/

the Drift chat API is installed is not limited to merely furnishing those communications back to the website owner, but that capability extends to using those communications to improve its entire AI platform for any business ends it chooses.

24. Accordingly, upon information and good faith belief, at all times relevant to this action, Drift analyzes and uses the chat conversations it intercepts and records on Defendant's website to, *inter alia*, improve its SaaS platform, including proprietary machine learning for its chatbots and related technologies, all of which *independently benefits and serves the profit-driven interests of Drift's shareholders*. In other words, Drift uses the content of the conversations that Plaintiff and Class Members have with Defendant—without Plaintiff's or Class Members' consent—to improve the technological function and capabilities of its proprietary, patented[5] artificial intelligence software assets for the exclusive purpose and benefit of increasing the value of Drift's shareholders' equity in the company and its technologies.

25. Defendant neither informs visitors of this conduct nor obtains their consent to these intrusions.

26. Drift also boasts that it harvests data from the chat transcripts it intercepts, eavesdrops upon, interprets, analyzes, stores, and uses for a variety of additional purposes—all without Plaintiff's or class members' consent—saying, "In short, Drift does not allow conversations to be deleted. This is because Drift doesn't want to lose any activity with your contacts and/or leads. Instead of deleting conversations, Drift utilizes Conversation Statuses to help organize your chats."[6]

27. Drift claims that it analyzes Plaintiff's and class members' conversations to determine the likelihood they will buy a product or service from

---

[5] https://www.drift.com/press-releases/drift-issued-patent/

[6] *See* https://gethelp.drift.com/s/article/Live-Chat-Product-Guide

Defendant. Specifically, Drift creates a "CQL score" for each unsuspecting visitor based on the degree to which Drift's AI thinks (1) they are interested in buying Defendant's produce or service and (2) their goals can be accomplished with Defendant's product or service. Each unsuspecting visitor has their conversations analyzed in combination with numerous other attributes that Drift has collected about the visitor, including through "Drift Intel." Drift Intel is comprised of Salesforce record details, HubSpot record details (using the email address of the visitor or data collected using the HubSpot cookie), a visitor's recently visited webpages, and the "full activity timeline" of the visitor. This data is measured in tandem with every detail that Drift can collect about a visitor's chat conversation, including the full transcript of the conversation, the date and time the conversation began, the IP address of the visitor, the web browser they used to access the Website (Chrome, Firefox, etc.), the device they used to have the chat conversation (iPhone 14, Microsoft Surface Pro, etc.), and which words in the visitor's conversation triggered Drift's software to route the visitor to a particular person or "bot playbook." Drift then creates an audit log to explain why the software analyzed the visitor in a particular way and creates "tags" to label and organize the visitor's conversation with other unsuspecting visitors' conversations.[7]

28.  In addition, Drift utilizes a number of cookies to record a Website visitor's activity during and after the visitor's chat sessions with Defendant and to link to a current chat the transcripts of previously intercepted chats between the visitor and Defendant.[8]

29.  These are but a few examples of how Drift used and uses—for its own business purposes—Plaintiff's and class members' conversations with Defendant that it intercepted in real time without Plaintiff's and class members' consent.

---

[7] *Id.*

[8] *Id.*

30. In sum, Drift has the capability to use chat communications on Defendant's website to (i) improve Drift's own products and services; (ii) develop new Drift products and services; and (iii) analyze chat communications to assist with customer service interactions and data analytics.

31. Drift's exploitation, modernization, use of, and interaction with the data it gathers through the chat feature in real time makes it more than a mere "extension" of Defendant.

32. Given the nature of Defendant's business, visitors often share highly sensitive personal data with Defendant via the Website's chat feature, including personal health and disability information and financial information, to name a few. Visitors would be shocked and appalled to know that Defendant secretly records those conversations and allows a third party to secretly eavesdrop on these recorded conversations in real time under the guise of "data analytics." Visitors would also be shocked to learn that Defendant allows a third party to interpret, analyze, and also use these intercepted conversations for that third party's own uses and business purposes.

33. Defendant's conduct is illegal, offensive, and contrary to visitor expectations: indeed, a recent study conducted by the Electronic Privacy Information Center, a respected thought leader regarding digital privacy, found that: (1) nearly 9 in 10 adults are "very concerned" about data privacy, and (2) 75% of adults are unaware of the extent to which companies gather, store, and exploit their personal data.

34. Within the statute of limitations period, Plaintiff visited the Website. Plaintiff and the class members used smart phones (cellular telephones with integrated computers to enable web browsing) and/or wifi-enabled tablets and laptops that use a combination of cellular and landline telephony and engaged with the "chat" feature of the Website to communicate with Defendant. As such, class

member conversations with Defendant were transmitted from "cellular radio telephones" and/or "landline telephones" as defined by CIPA.

35. Upon information and good faith belief, during the entire class period, the chat feature on Tonal's website employed Drift's AI chatbots, and Plaintiff and Class Members communicated with Tonal using the chat feature employing Drift's AI chatbots.

36. By definition, Defendant's chat communications from its website are transmitted to website visitors by either cellular telephony or landline telephony.[9]

37. The contents of Plaintiff's communications with Defendant, which Defendant aided Drift to secretly intercept, included every word that she sent to Defendant through the chat feature. Specifically, Plaintiff sent the following communications using the chat feature: "**Yes, please connect me to someone**"; "**What's the most inexpensive model?**"; and "**Oh. How much is it with installation please?**"

38. Defendant did not inform Class Members that Defendant was secretly recording their chat conversations or allowing, aiding, and assisting Drift to intercept and eavesdrop on them in real time.

39. Defendant did not inform Class Members that Defendant was allowing, aiding, or assisting Drift to read, attempt to read or to learn the contents or meaning of Class Members' chat conversations on the Website in real time while those conversations were being sent from or received in California.

40. Defendant did not inform Class Members that Defendant was allowing, aiding, or assisting Drift to use or attempt to use or to communicate information previously obtained from Class Members' chat conversations on the Website—let alone to exploit that information for financial gain.

---

[9] *See* https://www.britannica.com/technology/Internet, *"The Internet works through a series of networks that connect devices around the world through telephone lines"* (last downloaded February 2023).

41. Defendant did not obtain Class Members' express or implied consent to wiretap or allow Drift to eavesdrop on visitor conversations, nor did Class Members know at the time of the conversations that Defendant was secretly recording them and allowing third parties to eavesdrop on them.

42. Indeed, on information and belief, Defendant knew that being truthful and transparent about their conduct may dissuade people from using the chat feature of the Website—and thereby deprive Defendant of those persons' valuable data that Defendant sought to secretly and sophisticatedly exploit.

## CLASS ALLEGATIONS

43. Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class") defined as follows:

> All persons within the state of California who within the statute of limitations period: (1) communicated with Defendant via the chat feature on the Website, and (2) whose communications were recorded and/or eavesdropped upon in real time by Drift or any other third party without prior consent.

44. Excluded from the Class are Defendant, its past or current officers, directors, affiliates, legal representatives, predecessors, successors, assigns and any entity in which any of them have a controlling interest, as well as all judicial officers assigned to this case and their immediate families.

45. NUMEROSITY: Members of the Class are so numerous and geographically dispersed that joinder of all members of the Class is impracticable. Plaintiff believes that there are hundreds of thousands of members of the Class widely dispersed throughout the United States. Class members can be identified from Defendant's records.

46. COMMONALITY: Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members of the Class because Defendant has acted on grounds generally applicable to the Class.

Such generally applicable conduct is inherent in Defendant's wrongful conduct. Questions of law and fact common to the Class include:

    a. Whether Defendant caused electronic communications from Class Members with the Website to be recorded, intercepted, and/or monitored;

    b. Whether Defendant aided a third party in eavesdropping on such communications in real time;

    c. Whether Class Members consented to Defendant's disclosure of their private conversations to third parties in the manner required by CIPA [Cal. Penal Code § 631(a)];

    d. Whether any Third Party read or attempted to read or to learn the contents or meaning of Class Members' chat conversations on the Website in real time while those conversations were being sent from or received in California;

    e. Whether any Third Party used or attempted to use or to communicate information that was previously intercepted from Class Members' chat conversations;

    f. Whether the Class is entitled to damages as a result of Defendant's conduct.

47. <u>TYPICALITY</u>: As persons who visited the Website and whose electronic communication was recorded, intercepted and eavesdropped upon, Plaintiff is asserting claims that are typical of the Class.

48. <u>ADEQUACY:</u> Plaintiff will fairly and adequately protect and represent the interests of the members of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Class. Plaintiff is represented by counsel with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically.

49. <u>SUPERIORITY</u>: Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## FIRST CAUSE OF ACTION

### Aiding Violations of the California Invasion of Privacy Act
### Cal. Penal Code § 631(a), Clause Four

50. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

51. Section 631(a) of California's Penal Code imposes liability upon any entity who "by means of any machine, instrument, contrivance, or in any other manner," (1) "intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system," or (2) "**willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state**" or (3) "**uses, or attempts to use, in any manner, or for any purpose,**

**or to communicate in any way, any information so obtained**[.]" Clause Two is often referred to as "interception," and Clause Three as "use."

52. Section 631(a) also imposes liability upon any entity "**who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section**".

53. Here, Defendant aids Drift to commit both unlawful interception and unlawful use under Section 631(a), surreptitiously and as a matter of course.

54. Section 631 of the California Penal Code applies to internet communications and thus applies to Plaintiff's and the Class's electronic communications with the Website. "Though written in terms of wiretapping, Section 631(a) applies to Internet communications. *Javier v. Assurance IQ, LLC*, No. 21-16351, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022).

55. Drift's software embedded on the Website to intercept, eavesdrop upon, and record Plaintiff's and the Class's communications qualifies as a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct alleged herein.

56. At all relevant times, Defendant intentionally caused the internet communications between Plaintiff and Class Members on the one hand and Defendant's Website on the other hand to be intercepted, eavesdropped upon, and recorded by Drift by using its software embedded into the Website. Defendant paid Drift for its services to do exactly that, and more.

57. By its use of Drift's software, Defendant aided Drift to intercept and eavesdrop upon such conversations in real time while those conversations were being sent from or received in California.

58. By its use of Drift's software, Defendant aided at least one third party to read, attempt to read or to learn the contents or meaning of Plaintiff's and Class

Members' chat conversations on the Website in real time while those conversations were being sent from or received in California.

59. By its use of Drift's software, Defendant aided Drift to use or attempt to use or to communicate information previously intercepted from Plaintiff's and Class Members' chat conversations on the Website while those conversations were being sent from or received in California.

60. Plaintiff and Class Members did not expressly or impliedly consent to any of Defendant's actions.

61. Defendant's conduct constitutes numerous independent and discreet violations of Cal. Penal Code § 631(a), entitling Plaintiff and Class Members to injunctive relief and statutory damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief against Defendant:

A. An order certifying the Class, naming Plaintiff as the representative of the Class and Plaintiff's attorneys as Class counsel;

B. An order declaring Defendant's conduct violates CIPA;

C. An order of judgment in favor of Plaintiff and the Class and against Defendant on the causes of action asserted herein;

D. An order enjoining Defendant's conduct as alleged herein and any other injunctive relief that the Court finds proper;

E. An order awarding damages, including statutory damages where appliable, to Plaintiff and the Class in amount to be determined at trial;

F. An Order awarding Plaintiff and the Class their reasonable litigation expenses and attorneys' fees;

G. An Order awarding Plaintiff and the Class pre-judgment and post-judgment interest, to the extent allowable; and

H. All other relief that would be just and proper as a matter of law or equity, as determined by the Court.

# JURY DEMAND

Plaintiff, individually and on behalf of the proposed Class, demands a trial by jury on all issues so triable.

DATED: October 21, 2024

Respectfully Submitted,

*/s/ Andrew R. Tate*

**PEIFFER WOLF CARR KANE CONWAY & WISE, LLP**
ANDREW R. TATE
(GA Bar # 518068)*
*atate@peifferwolf.com*
235 Peachtree Street NE
Suite 400
Atlanta, GA 30303
Tel: (404) 282-4806

BRANDON M. WISE
(IL Bar # 6319580)*
*bwise@peifferwolf.com*
One US Bank Plaza, Suite 1950
St. Louis, MO 63101
Tel: (314) 833-4825

**LAW OFFICES OF RONALD A. MARRON**
RONALD A. MARRON
*ron@consumersadvocates.com*
ALEXIS M. WOOD
*alexis@consumersadvocates.com*
KAS L. GALLUCCI
*kas@consumersadvocates.com*
651 Arroyo Drive
San Diego, California 92103
Telephone: (619) 696-9006

Facsimile: (619) 564-6665

*(pro hac vice)*

**Counsel for Plaintiff and the Proposed Class**